**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. <u>1:19-CV-352</u>

E.A, a minor child,

     Plaintiff,

v.

Denver Public Schools (DPS) District

     Defendant.

---

### PLAINTIFFS' CLASS ACTION COMPLAINT AND JURY DEMAND

---

Plaintiff, E.A., individually and as class representative, hereby respectfully files this action against Defendant Denver Public School District ("DPS"), through Igor Raykin of Kishinevsky & Raykin, Attorneys at Law, and states on information and belief as follows.

### I.     JURISDICTION AND VENUE

1.     The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343. Federal question jurisdiction arises under the Constitution and laws of the United States of America, including but not limited to the Individuals with Disabilities Education Act (20 U.S.C. § 1400 *et seq*.), Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 701 *et seq*.) and the Fourteenth Amendment to the United States Constitution pursuant to 48 U.S.C. § 1983.

2.     Venue is proper under 28 U.S.C. § 1391(b) because the Denver Public School District resides within the District of Colorado and all of the events that are the subject of this Complaint took place and are expected to take place within the District of Colorado.

3.      Plaintiff is a special education student with DPS, and Plaintiff represents a class of DPS special education students.

## II.      STATEMENT OF FACTS

4.      Under the Individuals with Disabilities Education Act (IDEA), 20 U.S. Code § 1400, *et seq*, the federal government provides funds to the states and, in exchange, states must provide special education and related services to students with disabilities. (See, e.g., *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 295-96 (2006); *Schaffer v. Weast*, 546 U.S. 49, 51 (2005).

5.      Similar requirements exist under Section 504 of the Rehabilitation Act of 1973 (Section 504). 29 U.S. Code § 794*, et seq.*

6.      On Monday, February 11th, 2019, DPS teachers, including special education teachers, went on strike and are no longer providing these services to special education students.

7.      Because of the strike, more than 10,000 DPS special education students are and will be extremely impacted. Many of the students in this group are in need of the most critical support to maintain their health and safety, including students with severe intellectual disabilities and serious health conditions.

8.      These students require assistance from essential employees, such as special education teachers, counselors, social workers, school psychologists, and therapists, and medical needs such as feeding tubes or breathing apparatuses operated by those employees and school nurses. Without these critical services, these students' health and safety would be in jeopardy. They could get hurt, hurt themselves and/or hurt others.

9.      DPS's replacements for these essential employees are or are likely to be substitute teachers with inadequate training and experience necessary to meet the needs of disabled children in DPS.  They also are unlikely to meet state and federal requirements for who may actually provide necessary services to these children with disabilities.

10.     DPS is required to provide services and service hours to students with disabilities based on their Individualized Education Programs (IEPs) and/or 504 plans.  The strike will cause severe emotional and psychological trauma for special education students, especially the large number of DPS students who suffer from autism.  Students with autism typically do not handle changes in routine well.

11.     With unexpected changes in routine, some autistic students may end up hurting themselves, hurting others and possibly suffering setbacks for months as a result of not receiving proper services.

12.     In addition, some of the special education students in DPS are identified as emotionally disturbed, and the strike will cause emotional and possible physical harm to these students, who are immensely dependent upon these special education, medical and related services.

13.     Teachers on strike are specially trained both initially and with continuing education to best serve the needs of special education children.  Having a person who knows the child, knows their needs, who the child is comfortable with, and who is capable of addressing the needs of special education students is essential, and substitutes will not satisfy DPS's obligations under federal law to comply with Individualized Education Plans and 504 plans.

14. These students are now without these essential services that DPS is legally bound to provide, and DPS has not publicly put any plan in place to provide these services to the affected special education students.

15. It is extremely unlikely that DPS will be able to obtain sufficient substitutes to cover for striking teachers who provide services to DPS students with disabilities and all their varied, medical, intellectual, and social-emotional needs.

16. Additionally, if DPS is forced to merge classes or relocate students in order to handle the strike and its effect on special education students, this would have a severe negative impact on the District's blind and visually impaired students, who spend a significant amount of time learning mobility and orientation within their assigned school and classroom. This would be undermined and could cause physical harm to the students. That possibly could force these students to be confined to a classroom, damaging their social-emotional progress.

17. Hearing-impaired students will also be severely impacted because their communication and access to sign language would likely be limited.

18. The District is on strict federal guidelines to ensure that students with disabilities are provided, and not systematically deprived of, special education and related services.

19. A district must implement a student's IEP with all required components. 34 CFR 300.323(c)

20. To succeed in a special education action based on failure to implement an IEP, a student "must demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP." *Turner v. District of Columbia*, 952 F.Supp.2d 31, 40 (D.D.C. 2013) quoting *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000).

21.     It is simply impossible for the District to implement thousands of IEPs for disabled children without having properly trained staff during the strike in order to do so.

22.     "In some cases, the failure to provide the requisite number of hours of instruction or services provided in the student's IEP has been found to be a material failure to implement." *Id.* at 40, quoting *Savory v. District of Columbia*, 844 F.Supp.2d 23, 34 (D.D.C. 2012).

23.     Almost every student on an IEP has to have a certain amount of special education service delivery minutes that must be provided to that student on a steady basis. These minutes must be provided by specially trained teachers and service providers.

24.     Substitute teachers in most cases do not have that special training and, therefore, cannot provide the minutes properly in a manner to satisfy federal law.

25.     It is the proportion of services mandated to those provided that is the crucial measure for purposes of determining whether there has been a material failure to implement. *Id.* at 41

26.     For a failure to implement an IEP to be material, it is not required that the child suffer demonstrable educational harm in order to prevail. *Van Duyn ex rel. Van Duyn v. Baker School Dist. 5J*, 502 F.3d 811, 822 (9th Cir. 2007). In this case, student's IEP required 8-10 hours of math instruction per week, but the school was coming up on average five hours a week short. This was a material failure.

27.     With droves of substitute teachers at the helm at DPS – and with no replacements for special service providers – DPS is looking at tens or hundreds of thousands of minutes on a daily basis that it will fail to provide to numerous disabled children.

28.     In addition, those substitute teachers will almost certainly be unaware of each student's IEP treatment plan and will not be properly credentialed as special education teachers as required by IDEA.

29.     *See also Woods v. Northport Public School*, 487 Fed.Appx.968, 975 (6th Cir. 2012), where the court found that when a school failed to provide student with time in the resource room with a teacher certified in education of students with autism and failed to provide student with consultation services with autism intervention specialist, the student showed a material failure to implement the IEP.

30.     Under section 504, "…the provision of an appropriate education is the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met and (ii) are based upon adherence to procedures that satisfy the requirements of §§ 104.34, 104.35, and 104.36." 34 CFR § 104.33(b).

31.     When alleging a denial of a free appropriate public education (FAPE) under Section 504, one must show that the special education or related services provided were inadequate compared to those services provided to students without disabilities. "The most important differences are that, unlike FAPE under the IDEA, FAPE under § 504 is defined to require a comparison between the manner in which the needs of disabled and non-disabled children are met, and focuses on the 'design' of a child's educational program." *Mark H. v. Lemahieu*, 513 F.3d 922, 933 (9th Cir. 2008).

32.     The U.S. Office for Civil Rights (OCR) found a denial of FAPE under 504 when a school failed to provide related aids and services designed to meet the student's individual educational needs. A student was evaluated under 504 and seven accommodations were

approved for the 2009-2010 and 2010-2011 school years. Additionally, eight accommodations were approved for the 2011-2012 school year. Both lists of accommodations included "one-on-one testing for regular classroom tests," and the OCR found that because the school failed to consistently provide this service, the school failed to provide "the Student related aids and services as specified by his Section 504 plan" and therefore denied the student FAPE. *Mansfield (AR) Pub. Schs.*, 59 IDELR 265 (OCR 2012).

33.     Similar denials are substantially likely to occur in Denver Public Schools.

34.     DPS is engaged in a pattern of institutional discrimination against disabled kids because the substitute teachers it will be bringing in to serve general education, non-disabled children will or are likely to be qualified under Colorado law. However, the substitute teachers will not be or are unlikely to be qualified under Colorado and federal law when it comes to educating special education students.

35.     Moreover, there is absolutely no plan that DPS has announced for how it will temporarily replace service providers during the strike.

36.     On its face, this means that DPS has prioritized the education of non-disabled children over those of children with disabilities.

### III.     CLASS ALLEGATIONS

37.     Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

38.     Plaintiffs propose a single class for certification pursuant to F.R.C.P. 23(a) and (b)(3), with the following class definition: all special education students, currently enrolled at a school within the Denver Public Schools District who are on an Individualized Education

Plan or 504 Plan. According to DPS, there are 10,642 students with disabilities enrolled in DPS schools (per DPS published "Students with Disabilities Report", https://financialservices.dpsk12.org/student-submissions/; https://drive.google.com/file/d/11KDPioioztzDGlN3t3Z8HnIbC9uvw8c7/view).

39.     The foregoing class definition and the facts alleged demonstrate that this case is one that is uniquely well-suited for certification: a cohesive group of Plaintiffs, who share the same legal relationship with Denver Public School district, who suffered damages as a result of a single wrongful act or omission, or closely-connected series of acts or omissions, and whose individual claims lack significant individual value.

40.     The proposed class definition and the facts alleged also satisfy the discrete requirements of F.R.C.P. 26(a) and (b)(3).

## The Proposed Class Satisfies F.R.C.P. 23(a)(1)-(4)

41.     First, the class is so numerous that joinder of all members is impracticable under F.R.C.P. 23(a)(1). There are over 10,000 students at DPS with IEPs and/or 504 plans who are equally damaged by DPS's failure to provide services during the strike. Having several thousand individual Plaintiffs appear in one pleading, testify at trial, serve discovery, respond to discovery, and appear at trial would be unmanageable and a waste of judicial resources, especially given the average value of each claim. Joinder of all members is completely impracticable with the large number of students and their parents who would be involved in such a suit.

42.     Second, there are questions of law or fact common to the class under F.R.C.P. 23(a)(2). Each of the Plaintiffs and proposed class members have suffered the same legal wrong, as a consequence of the same act or omission, or series of act or omissions, have the same legal relationship with DPS, and have all suffered damages of the same type.

43.     It would be impossible to prove the Plaintiffs' claims without also simultaneously proving the proposed class members' claims. Nearly every question of law or fact in this action is common to the class and the Plaintiffs.

44.     Third, the claims of the Plaintiffs are fairly typical of the proposed class members under F.R.C.P. 23(a)(3). Every one of the Plaintiffs and the proposed class members have the same claim that arises from the same factual and legal foundation: they are all enrolled students at DPS who are classified as special education students with an IEP/504 plan. There is no material deviation between the facts and law giving rise to Plaintiffs' claims and those of the proposed class members.

45.     Fourth, the representative parties will fairly and adequately protect the interests of the class under F.R.C.P. 23(a)(4). The Plaintiffs have undertaken significant time and effort to obtain information from the proposed class members and organize information essential to the filing of this action.

46.     Moreover, undersigned counsel specializes in and has significant experience in education law generally and special education law specifically, having appeared in hundreds of special education matters in jurisdictions across Colorado.

**The Proposed Class Satisfies F.R.C.P. 23(b)(3)**

47.     The proposed class also satisfies and should be maintained as a class action under F.R.C.P. 23(b)(3). More specifically, there are not only questions of law or fact common to the Plaintiffs and the proposed class members, but those common questions predominate over any individual issues.

48.     Moreover, the class action device is the most appropriate for the fair and efficient adjudication of this controversy, because it will combine this litigation into one forum, there are no other large-scale actions that have been filed, and no unique difficulties exist in the management of this action, which will only require limited discovery.


**No Requirement to Exhaust Administrative Remedies**

49.     Any action based on a violation of an IEP generally required first filing with an administrative law court.

50.     However, in a class action alleging widespread, systemic violations of the IDEA, this is not necessary.  J.G. v. Board of Educ. of Rochester City Sch. Dist., 559 IDELR 136 (2d Cir. 1987) ("Claims of systemic violations of EHA, alleged to be inherent in education agency's program and not directed at any specific child, appropriately challenged in class action, need not exhaust administrative hearing process").


**IV.     CLAIMS AND CAUSES OF ACTION**

**A.     FIRST CLAIM FOR RELIEF – Denial of a Free Appropriate Public Education in Violation of IDEA.**

51.     Plaintiffs reallege all other paragraphs as if fully set forth herein.

52.     "Free appropriate public education or FAPE means special education and related

53.     services that -- (a) Are provided at public expense, under public supervision and direction, and without charge ... (c) Include an appropriate preschool, elementary school, or secondary school education in the State involve; and (d) Are provided in conformity with an individualized education program (IEP) that meets the requirements of §§300.320 through 300.324." 34 CFR § 300.17.

54.     The IDEA's substantive provisions are violated if: (1) the LEA [in this case, the school Districts] fails to provide a child with FAPE; or (2) a FAPE is provided, but not to the maximum extent appropriate. *LB and JB v. Nebo School District*, 379 F.3d 966 (10th Cir. 2004).


B.     **SECOND CLAIM FOR RELIEF – Denial of a Free Appropriate Public Education in Violation of Section 504 of the Rehabilitation Act of 1973.**

55.     Section 504 requires that districts "provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap."34 CFR 104.33 (a).

56.     FAPE under Section 504 requires that districts provide education or related services designed to meet the needs of students with disabilities as adequately as the district meets the needs of students without disabilities.34 CFR 104.33 (b); and Mark H. v. Lemahieu, 49 IDELR 91 (9th Cir. 2008).

57.     Section 504 defines appropriate education as "the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of [students with disabilities] as adequately as the needs of [nondisabled] persons are met and (ii) are based upon adherence to [Section 504] procedures."  34 CFR 104.33 (b)(2).

58.     Section 504 focuses on whether students with disabilities are receiving educational services that are as effective as those made available to their nondisabled peers.

59.     Although the standards are similar, courts have held that FAPE under the IDEA and FAPE under Section 504 are distinct standards.  FAPE under the IDEA is an affirmative duty to provide an appropriate public education, whereas FAPE under Section 504 is a negative prohibition against discrimination. *C.G. v. Commonwealth of* Pennsylvania Dep't of Educ., 62 IDELR 41 (3d Cir. 2013). See also In re: Student with a Disability, 113 LRP 42334 (SEA NY 09/13/13) (concluding that a violation of Section 504's LRE requirement at 34 CFR 104.34 , requiring comparable services and activities, was not analogous to any IDEA regulation).

## V.     REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and award all relief allowed by law and equity, including but not limited to the following:

(i) DPS must be required to immediately inform the parents of all disabled children how it will meet the special education needs of those children during the strike;

(ii) DPS must be required to immediately inform the parents of all disabled children how it will satisfy the service delivery minutes of those disabled children who lose those minutes during the strike.

(iii) DPS must be required to immediately inform the parents of all disabled children how, when, where and to what extent it will be providing compensatory special education services to disabled children who are currently missing out on those services.

(iv) DPS must take all steps to ensure that every child with a disability in the district receive proper services as required by federal law during the strike.

(v) DPS must contract with outside service providers immediately to provide the necessary special education services to all disabled children.  If it fails to do so, then it must be ordered by the Court to pay for a fund to provide such services.

 (vi) Any further relief that this Court deems just and proper; and

(vii) Any other relief as allowed by law.


s/ Igor Raykin
Igor Raykin, Esq.
Kishinevsky & Raykin, Attorneys at Law
2851 South Parker Road, Suite 150
Aurora, CO 80014
Telephone: (720) 863-4256
E-mail: igor@coloradolawteam.com


s/ Tyler Jeffery
Tyler Jeffery, Esq.
Kishinevsky & Raykin, Attorneys at Law
2851 South Parker Road, Suite 150
Aurora, CO 80014
tyler@coloradolawteam.com

Attorney for Plaintiff(s)